AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

| | | |
|---|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Google LLC Cloud Account Associated with the Gmail<br>hhrndz030701@gmail.com | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No.    25mj5672 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein.

located in the _____ **Southern** _____ District of _____ **California** _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 952, 960, 963 | Importation of controlled substances and conspiracy to do the same |

The application is based on these facts:

See attached affidavit, incorporated herein.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

SERGIO RAMIREZ JR    Digitally signed by SERGIO RAMIREZ JR
Date: 2025.10.17 09:08:13 -07'00'

_____
*Applicant's signature*

Sergio Ramirez, HSI Special Agent
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date:    Oct. 17, 2025
_____

_____
*Judge's signature*

City and state: _____

_____
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**APPLICATION FOR SEARCH WARRANT FOR GOOGLE ACCOUNT**

I, Sergio Ramirez, being duly sworn, declare and state:

## INTRODUCTION

1.     I make this affidavit in support of an application for a search warrant for information related to the account associated with the following identifiers, as described further in Attachment A, that is stored at premises owned, maintained, controlled, and/or operated by Google LLC and Google Payment Corporation ("Google"), an electronic communications service and remote computing service provider headquartered 1600 Amphitheater Parkway, Mountain View, CA 94043:

> Email: hhrndz030701@gmail.com
>
> Name: Manuel HERNANDEZ Jauregui
>
> Date of Birth: 03/07/2001
>
> Telephone Number: 760-960-6936
>
> IMEI: 310260221578899
>
> (Herein referred to as the **Subject Account**)

and any accounts linked to the **Subject Account** (i) by cookie; (ii) as a secondary or recovery email address; (iii) as a forwarding or fetching account; (iv) by a shared recovery email address; (v) by shared creation IP address; or (vi) by shared telephone number from July 1, 2025 to August 1, 2025 for items that constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, importation of controlled substances and conspiracy to do the same, in violation of Title 21, United States Code, Sections 952, 960, and 963 (**Target Offenses**), as described more in Attachment B.

2.     This affidavit is made in support of an application for a search warrant under Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Google to disclose to the United States copies of the information (including the content of communications) described in Section II of Attachment B. Upon receipt of

the information, United States-authorized persons will review that information to locate the items described in Section III of Attachment B.

3.     As further discussed below, there is probable cause to believe that (i) the user of the **Subject Account**, Manuel HERNANDEZ Jauregui, has committed the Target Offenses; (ii) the **Subject Account** has been used by Mr. HERNANDEZ to facilitate the commission of the Target Offenses; and (iii) the data obtained from the **Subject Account** will constitute and/or lead to evidence, fruits, and instrumentalities of the Targe Offenses as well as to the identification of the individuals who are committing those and related crimes.

4.     The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; interviews of witnesses and members of the targeted drug trafficking organization; my review of documents and computer records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for search warrants, it does not set forth each and every fact that I or others have learned during the course of this investigation. All dates, times, and amounts discussed herein are approximate.

## EXPERIENCE AND TRAINING

5.     I am a Special Agent with the Department of Homeland Security and have been since July 3, 2023. I am currently assigned to the Calexico Assistant Special Agent-in-Charge. I am a law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

6.       I have been employed with Homeland Security Investigations (HSI) since July 2023. During that period, I attended the Criminal Investigator Training Program (CITP) academy at the Federal Law Enforcement Training Center (FLETC) between the months of August 2023 and November 2023. I also attended the Homeland Security Investigations Special Agent Training (HSISAT) academy at the Federal Law Enforcement Training Center (FLETC) between the months of November 2023 and February 2024. In these capacities, my duties included investigating federal criminal offenses involving immigration violations, customs' violations, narcotics violations, firearms violations and child exploitation violations.

7.       Furthermore, I was a peace officer in the State of California from 2014 to 2023 for the El Centro Police Department. During this period, I was trained and worked on multiple cases involving crimes against persons (homicides, assaults, and death investigations), crimes against property, narcotics crimes, and sex crimes (including rape, child exploitation, and child pornography).

8.       During this time, I received over 500 hours of advanced officer training. I held a California Peace Officer Standardized Training (P.O.S.T.) Basic, and Intermediate certificate.

9.       During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California. Through my training, experience, and work with other law enforcement officers experienced in drug trafficking investigations, I have gained a working knowledge of the operational habits of drug traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry. My work on these investigations has resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for controlled substances violations.

10.      I am aware that it is common practice for illicit drug smugglers to work in concert with other individuals and to do so by utilizing cellular telephones. Because

they are mobile, the use of cellular telephones permits illicit drug traffickers to easily carry out various tasks related to their trafficking activities, including, e.g., remotely monitoring the progress of their contraband while it is in transit, providing instructions to drug couriers, warning accomplices about law enforcement activity, and communicating with co-conspirators who are transporting narcotics and/or proceeds from narcotics sales.

11.    I know that drug traffickers often require the use of a telephone facility to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sales of controlled substances. I know that professional drug operations depend upon maintaining their extensive contacts. The telephone enables drug traffickers to maintain contact with associates, suppliers, and customers. I also know that drug traffickers sometimes use fraudulent information, such as fictitious names and false addresses, to subscribe to communication facilities, especially cellular phones, and frequently change communication facilities to thwart law enforcement efforts to intercept their communications. They also often use coded language to obscure conversations about their unlawful activity because they believe coded language makes it more difficult to identify their conduct.

12.    Based upon my training, experience, and consultations with law enforcement officers experienced in drug trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that cell phones can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. Some of the third-party applications that drug traffickers use to communicate with each other or to document their drug trafficking activities include Google Messages, Google Hangouts, Google Meet, Google Chat, Google Duo, Google Photos, and Google Drive. The electronic evidence generated by or stored on cell

phones can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone.

13.    Much, if not all, of the same information generated by and stored on the cell phones themselves can also be stored in a remote "cloud" account associated with the cell phone or with the owner or user of the cell phone. For example, Apple—the company that manufactures iPhones and provides the operating system that runs on the iPhone, iOS—allows iPhone users to create an "iCloud" account, also known as an Apple ID. iPhone users can back up much of the data stored on their iPhones to their remote iCloud account. Once an iCloud account is set up and activated, this process of "backing up" an iPhone's data is generally automatic and not dependent on the user selecting which information to manually back up.

14.    Just as Apple makes iOS, the operating system for the iPhone, so too does Google make "Android," the operating system for many other manufacturers' phones, including Motorola's phones. The Android operating system allows users of Motorola phones (like Defendant) to create remote "cloud" accounts known as "Google Accounts." Users of phones running the Android operating system can back up much of the data stored on their phones to their Google Account. Similar to iPhone users backing up their information and data to iCloud accounts, the process of "backing up" an Android phone's data to the cloud/Google Account is generally automatic and not dependent on the user selecting which information to manually back up.

15.    Each Google Account is identified by an account-holder's username, usually an email address ending with "@gmail.com." This username is unique to a particular Google Account.

16.    In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of drug trafficking organizations. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in the affidavit. This affidavit is intended to

1  show simply that there is sufficient probable cause for the requested warrant and does
2  not set forth all of my knowledge about this matter.

3      17.    Based on the facts as set forth in this affidavit, there is probable cause to
4  believe that the information described in Attachment A contains evidence of violations
5  of Title 21, United States Code Sections 952 and 960, as described in Attachment B.

6                                    **JURISDICTION**

7      18.    This Court has jurisdiction to issue the requested warrant because it is "a
8  court of competent jurisdiction" as defined by Title 18, United States Code, Section
9  2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district
10  court of the United States . . . that has jurisdiction over the offense being investigated."
11  18 U.S.C. § 2711(3)(A)(i).

12                         **STATEMENT OF PROBABLE CAUSE**

13  **A.    Facts Supporting Probable Cause**

14      19.    On August 1, 2025, at approximately 1345 hours, Manuel HERNANDEZ
15  Jauregui ("HERNANDEZ"), a Mexican citizen, was encountered at the Andrade Port
16  of Entry (POE) vehicle lanes in Winterhaven, CA. HERNANDEZ approached primary
17  vehicle lane number 1 and provided a negative customs declaration. HERNANDEZ was
18  directed to the Z Portal after a computer-generated Automatic Target System (ATS) alert
19  following a primary query. The Z Portal was utilized to provide vehicle imaging and
20  assist with further processing of the vehicle. HERNANDEZ was the driver and sole
21  occupant of a green 2001 Ford Explorer Sportrac ("the vehicle") bearing California
22  license plates.The Z Portal machine detected anomalies in the rear cab wall behind and
23  under the rear seat of the vehicle. A Customs and Border Protection (CBP) Officer
24  working in the Vehicle Secondary lot assisted in escorting HERNANDEZ to the CBP
25  Secondary Office. CBP further screened the vehicle with a Human and Narcotics
26  Detection Dog (HNDD) named Soma. Canine Soma positively alerted to the rear seat
27  of the vehicle.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

20.    A search of the vehicle conducted by CBP officers led to the discovery of 75 packages of a white powdery substances that later field-tested positive for the presence of methamphetamine hydrochloride wrapped in cellophane. The packages were discovered in a non-factory compartment under the rear seat. The total weight of the Methamphetamine was 37.12 kgs.

21.    Homeland Security Investigations (HSI) Special Agents (SA) Ramirez and Task Force Officer Melendez responded to the Andrade Port of Entry after the discovery of the controlled substances. Upon arrival, HERNANDEZ was escorted to the HSI interview room for further processing.

22.    HERNANDEZ's biographical information was taken and SA Ramirez read him his Miranda Rights. HERNANDEZ waived his rights and agreed to provide a statement. HERNANDEZ stated he left his residence in San Luis, AZ early morning and crossed into Mexico through the San Luis Port of Entry. HERNANDEZ drove to his parent's residence which is located between Mexicali, Baja California and Algodones, Baja California. At around 1130 hours, HERNANDEZ drove to Algodones to a dentist appointment. After the dentist appointment, HERNANDEZ proceeded to travel back into the United States through the Andrade Port of Entry. HERNANDEZ said he was on his way to a friend's residence located in the outskirts of Yuma, AZ.

23.    HERNANDEZ denied knowledge of his vehicle being loaded with drugs. HERNANDEZ stated that nobody paid him to cross drugs into the United States and advised that no one had ever asked him to smuggle drugs in the past. HERNANDEZ denied ownership of the drugs and said he was not traveling to any location to offload his vehicle. HERNANDEZ claimed that he purchased the vehicle in June 2025 in Indio, CA and has used it as his primary vehicle since then. HERNANDEZ said he crosses the border at least once a week. HERNANDEZ said he had been referred to secondary his last few crossings and nothing had been discovered within his vehicle. HERNANDEZ believed the previous owner of the vehicle was responsible for the drugs being concealed. HERNANDEZ said he was the main driver of the vehicle and had only let a

friend borrow it a week after he purchased it. HERNANDEZ said he had not had the vehicle serviced since he purchased it.

24.    HERNANDEZ had a Motorola RAZR cell phone at the time he was detained for which he claimed ownership. HERNANDEZ consented to a search of his cell phone and signed the consent-to-search form. The search was conducted by SA Ramirez. HERNANDEZ said he bought his cell phone a few months prior. A basic search of HERNANDEZ's cell phone was conducted. It appeared most of his conversations on his WHATSAPP messaging application had been erased. HERNANDEZ had only three conversations open on WHATSAPP, all of which were messages from the day of the encounter. Additionally, the phone's call log showed fewer than eight calls and the contacts list contained only a few entries. When asked why his phone contained so little activity, HERNANDEZ claimed he did not use the WHATSAPP application, and rarely used his phone—he mostly used his wife's phone.

25.    In a later interview with HERNANDEZ's spouse, Yaxeni Aispuro Inzunza, SA Ramirez learned that the couple had been separated for months; HERNANDEZ did not live with her since they separated; and they had not spoken for nearly two months.

26.    HERNANDEZ was arrested and charged with importation of a controlled substance in violation of Title 21, United States Code, Sections 952 and 960. HERNANDEZ's cell phone was seized by SA Ramirez who also conducted the cell phone extraction.

27.    During a review of the cell phone, HSI discovered that device was associated with the email address hhrndz030701@gmail.com and phone number 7609606936. The device showed 5 emails addressed to hhrndz030701@gmail.com received between July 21 and July 27, 2025. The review also showed that certain messages and other data had been deleted from the device.

28.    Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that HERNANDEZ's cell phone was

used to coordinate and facilitate the importation of controlled substances within the United States, and that evidence of these offenses will be found stored on the Subject Account. Additionally, based on training and experience, I am aware that a download extraction, like that performed here, may not contain the same data that is saved to a Google Account. This is because forensic extractions of telephones are limited and may not be fully compatible with the telephone under question in order to seize all of the information that appears on that telephone. Alternatively, items deleted from the telephone may still appear in the Google Account.

**B.    Background on the Service Provider**

29.    Google is the provider (hereinafter "the Provider") of the **Subject Account** identified by "hhrndz030701@gmail.com" and phone number 7609606936.

30.    The Provider provides electronic communication services and remote computing services to their subscribers. The Provider commonly asks subscribers to select a username or ID and to provide personal identifying information when registering for an account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, email addresses, and, for paying subscribers, a means and source of payment (including any credit or bank account number). The Provider typically retains transactional information about the creation and use of each account. This information can include the date on which the account was created, the length of service, records of log-in and session times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account, and other log files that reflect usage of and connections to the account. In addition, providers often have records of the IP address used to register the account and the IP addresses associated with logins to the account. Because every device that connects to the Internet uses an IP address, IP address information can help to identify which computers or other devices were used to access an account.

31.     The Motorola RAZR are Android-powered smartphones that use Google services, including the Google Play store and other Google applications like Google Assistant and Google Drive for backing up data. Cell phones which use Google services are known for its seamless hardware and software integration. This integration is based on a Google Account being set up for the device to have the ability back-up and sync cloud data such as email, contacts, calendar events, photos, videos, and messages. This Google Account is typically opened with a Google email ("Gmail") account in the initial set up of the device, not doing so would significantly limit the phone's features and capabilities, and would exclude many core features like app downloads, cloud syncing, and access to the full range of Google services.

32.     Remote computing service customers often place files, software code, databases, and other data on the Provider's servers. To do this, customers connect from their own computers to the Provider's servers via the Internet. This connection can occur in several ways. In some situations, it is possible for a customer to upload files using a special web site interface offered by the web hosting company. It is frequently also possible for the customer to directly access the server computer through the Secure Shell ("SSH") or Telnet protocols. These protocols allow remote users to type commands to the web server. The SSH protocol can also be used to copy files to the server. Customers can also upload files through a different protocol, known as File Transfer Protocol ("FTP"). Servers often maintain logs of SSH, Telnet, and FTP connections, showing the dates and times of the connections, the method of connecting, and the IP addresses of the remote users' computers. Servers also commonly log the port number associated with the connection. Port numbers assist computers in determining how to interpret incoming and outgoing data. For example, SSH, Telnet, and FTP are generally assigned to different ports.

33.     The Provider's servers use those files, software code, databases, and other data to respond to requests from Internet users for pages or other resources from the website. Commonly used terms to describe types of files sent by a server include

HyperText Markup Language ("HTML") (a markup language for web content), Cascading Style Sheets ("CSS") (a language for styling web content), JavaScript (a programming language for code run on the client's browser), and image files. Providers frequently allow their customers to store collections of data in databases.

34.    Web sites deliver their content to users through the Hypertext Transfer Protocol ("HTTP"). Every request for a page, image file, or other resource is made through an HTTP request between the client and the server. The server sometimes keeps a log of all of these HTTP requests that shows the client's IP address, the file or resource requested, the date and time of the request, and other related information, such as the type of Web browser the client uses.

35.    Web sites are often known to the outside world by a domain name, such as www.uscourts.gov or www.amazon.com. Domain names must be registered to particular individuals. Sometimes, web hosting companies offer customers the separate service of registering domain names. When that occurs, web hosting companies typically retain information related to the domain name, including the date on which the domain was registered, the domain name itself, contact and billing information for the person or entity who registered the domain, administrative and technical contacts for the domain, and the method of payment tendered to secure and register the domain name.

36.    In some cases, a subscriber or user will communicate directly with a Provider about issues relating to a website or account, such as technical problems, billing inquiries, or complaints from other users. Providers typically retain records about such communications, including records of contacts between the user and the company's support services, as well records of any actions taken by the company or user as a result of the communications.

### PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

37.    Other than the cell phone extraction of HERNANDEZ's cellular phone, no other attempts have been made to search the **Subject Account**.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

38.     Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The Providers' personnel are not. It would be inappropriate and impractical for federal agents to search the Providers' vast computer network for the relevant accounts and then to analyze the contents of those accounts on the Providers' premises. The impact on the Providers' business would be disruptive and severe.

39.     Therefore, I request authority to seize all content, including electronic mail and attachments, stored messages, historical location information, web browsing history, photographs, notes, chats, SSH, Telnet, and FTP logs, web pages, software code, databases, websites, web pages, and any other data or content from the Providers account associated with the **Subject Account**, as described in Attachment B. In order to accomplish the objective of the search warrant with a minimum of interference with the Provider's business activities, to protect the privacy of the Provider's subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, the FBI seeks authorization to allow the Provider to make digital copies of the entire contents of the **Subject Account** subject to seizure. That copy will be provided to me or to any authorized federal agent. The copy will be imaged and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

40.     Analyzing the data to be provided by the Provider may require special technical skills, equipment, and software. It may also be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits" each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded

language, or account for slang. Keyword searches are further limited when electronic records are in or use foreign languages or, like in Chinese, foreign alphabets. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database, and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. The Provider does not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

41.    Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keyword searches need to be modified continuously based upon the results obtained and, depending on the organization, format, language, and alphabet of the records provided by the Providers, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination will complete the analysis within **90 days** of receipt of the data from the service provider, absent further application to this court.

42.    Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails and web hosting content that identify any users of the subject accounts and any electronic mails or communications sent or received in temporal proximity to incriminating electronic mails or communications that provide context to the incriminating mails or communications. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

1
2
3

43.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

4

### CONCLUSION

5
6
7
8
9
10

44.     Based on the foregoing, I submit there is probable cause to believe that the items identified in Attachment B have been used in the commission of a crime and will contain records constituting evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 952, 960, and 963, and that the foregoing will be found on the premises to be searched, as identified in Attachment A.

11
12

SERGIO RAMIREZ JR   Digitally signed by SERGIO RAMIREZ JR
Date: 2025.10.17 09:06:57 -07'00'
_____

13
14

Special Agent Sergio Ramirez
Homeland Security Investigations

15

16
17

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone this 17th day of October, 2025.

18
19
20

_____

21
22

Honorable Daniel E. Butcher
UNITED STATES MAGISTRATE JUDGE

23
24
25
26
27
28